JOHN SCHAFERSMAN AND EILEEN SCHAFERSMAN, HUSBAND AND
WIFE, APPELLANTS, V. AGLAND COOP, A NEBRASKA
COOPERATIVE CORPORATION, APPELLEE.

681 N.W.2d 47

Filed June 10, 2004.   No. S-02-1267.

James F. Cann and David A. Domina, of Domina Law, P.C., L.L.O., and John M. Thor for appellants.

Dan H. Ketcham and Jason R. Yungtum, of Engles, Ketcham, Olson & Keith, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellants, John Schafersman and Eileen Schafersman, allege that contaminated oats delivered to them by the appellee, Agland Coop (Agland), caused their dairy cows to become ill. To prove this allegation, the Schafersmans relied upon expert testimony. In *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Schafersman I*), we reversed a jury award for the Schafersmans, holding that the expert opinion testimony of their expert, Dr. Wallace Wass, failed to meet the *Frye* general acceptance test. But in *Schafersman I*, we also concluded that we would no longer employ the *Frye* test for determining the admissibility of expert opinion testimony. Instead, we adopted the standards that the U.S. Supreme Court first set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

We must decide whether the trial court erred in (1) determining that the opinion testimony of the Schafersmans' experts failed to meet the *Daubert* standards and (2) entering summary judgment for Agland. We affirm.

## I. FACTUAL BACKGROUND

The Schafersmans operate a commercial dairy farm. In June 1994, they ordered 40 bushels of unadulterated commercial grade oats from Agland, a cooperative that sells grain and feed. Agland delivered 3,260 pounds to the Schafersmans on June 22. It is undisputed that the oats delivered to the Schafersmans on June 22 were contaminated with "Envirolean 2.5L Swine Concentrate" (Envirolean), a premix concentrate for hogs

containing high-protein minerals, vitamins, and other micro-nutrients. Upon delivery, the contaminated oats were dumped into the Schafersmans' grinder-mixer so it could be mixed with other ingredients for the Schafersmans' dairy herd. This mix was then given to the cows.

When the mix was delivered, the Schafersmans owned 75 cows. Fifty-four of these cows were lactating. The 21 cows that were not lactating were located in a separate "dry lot." The Schafersmans claim that the contaminated oats were given to only the 54 lactating cows.

According to the Schafersmans, their cows went "off their feed" within days after the delivery. In other words, the cows were refusing their normal feed intake and were not milking efficiently. The Schafersmans also claim that several cows developed diarrhea within a few days of eating the contaminated oats.

Roughly 2 weeks after Agland had made the delivery, the Schafersmans stopped giving the cows the contaminated oats. However, according to John Schafersman, by July 1994, 23 cows that had consumed the contaminated oats had dried up, i.e., stopped lactating.

At the end of July 1994, the Schafersmans noticed that some cows were getting "yellow under the belly" and in the eyes. John Schafersman called Dr. James Grassmeyer, a local veterinarian. Grassmeyer conducted basic physical examinations on two or three cows and determined that at least one cow showed signs of jaundice. He did not, however, perform a liver biopsy on any cows. Grassmeyer suggested that the Schafersmans have the contaminated oats tested. However, at the original trial, he also testified that there were several possible causes for the cows' symptoms and that he had not attempted to ascertain the actual cause.

According to the Schafersmans, all the cows that had eaten the contaminated oats dried up within 6 months, none returned to normal milk production, and 10 died within 18 months of the time the contaminated oats were delivered. Others had difficulty breeding, and the following year, there was a high rate of aborted calves among those cows that had eaten the contaminated oats. By the end of 1995, all the cows that had eaten the contaminated oats had either died or been culled from the herd.

According to the Schafersmans, the 21 cows that had not eaten the contaminated oats remained healthy.

### 1. First Trial and *Schafersman I*

The Schafersmans filed a petition in which they alleged that Agland was negligent in delivering the contaminated oats. They sought damages for lost milk production, cows lost to death or slaughter, increased labor costs, and veterinary costs.

To establish that the contaminated oats had caused their cows to become ill, the Schafersmans relied on Wass' testimony, who at the time of the first trial was a professor in the department of diagnostic and production animal medicine at Iowa State University. Wass' testimony focused on the minerals that were present in the contaminated oats. For a dairy cow, a healthy diet includes the presence of several minerals, but too much of one mineral can be toxic. Several minerals were present in the contaminated oats above recommended levels. However, these levels were not above what dairy cows can tolerate. According to Wass, the aggregation of these minerals at above-normal quantities proved toxic to the cows and caused their symptoms. Wass labeled his theory "multiple mineral toxicity."

The trial court overruled Agland's objections to Wass' testimony, and the jury returned a $120,000 verdict for the Schafersmans. In an unpublished opinion, the Nebraska Court of Appeals affirmed. See *Schafersman v. Agland Coop*, No. A-98-623, 2000 WL 704984 (Neb. App. May 30, 2000) (not designated for permanent publication). We then granted Agland's petition for further review. We reversed, and remanded for a new trial, concluding that Wass' expert opinion testimony was not admissible. In so ruling, we applied the *Frye* test, which asks whether the scientific theory employed by the expert has " 'gained general acceptance in the particular field in which it belongs.' " *Schafersman I*, 262 Neb. at 222, 631 N.W.2d at 870 (quoting *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923)). We determined that Wass' multiple mineral toxicity theory had not gained general acceptance within the field in which it belongs. We also concluded that the record did not provide any other basis to support Wass' opinion. Specifically, we noted Wass admitted that he had not performed a differential diagnosis, which we

described as "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Schafersman I*, 262 Neb. at 223, 631 N.W.2d at 871.

But our conclusion that the court had erred in admitting Wass' expert opinion testimony did not end our analysis in *Schafersman I*. We went on to hold that the *Frye* test would no longer provide the means for determining the admissibility of expert opinion testimony in Nebraska. In its place, we adopted the test set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and its progeny. We held:

> [I]n those limited situations in which a court is faced with a decision regarding the admissibility of expert opinion evidence, the trial judge must determine at the outset, pursuant to Neb. Evid. R. 702, whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.

*Schafersman I*, 262 Neb. at 232, 631 N.W.2d at 876-77. We went on to state that "although Wass' testimony did not meet the requirements of the *Frye* test at the first trial, this does not necessarily preclude the Schafersmans from offering such testimony at a second trial." 262 Neb. at 232-33, 631 N.W.2d at 877.

## 2. Proceedings Following Remand

On remand, the Schafersmans once again relied on Wass' expert opinion testimony to prove that the contaminated oats had caused their cows to become ill. In addition, they retained two other experts, Dr. Raymond Gene White and Professor Vernon Oraskovich, who sought to testify that Wass employed a reliable methodology in reaching his conclusion. Because the primary issue on appeal is whether on remand the court abused its discretion in excluding the expert opinion testimony of Wass, White, and Oraskovich, we set out in detail their respective opinions, as well as the opinions of Agland's experts.

### (a) Wass

Wass continues to claim that the cows developed multiple mineral toxicity from the contaminated oats. In Wass' post-remand deposition, he testified that he was unaware of any studies or peer-reviewed articles supporting his theory. But he also stated that it was unlikely that dairy cows had previously been fed the same combination of minerals at the same levels received by the Schafersmans' cows either in a controlled experimental setting or at another dairy operation. He also suggested that the clinical situation presented at the Schafersmans' operation was similar to a scientific experiment, because the dry herd, which did not receive the contaminated oats, acted like a control group.

In addition, in his postremand deposition, Wass seems to have made a subtle change to his multiple mineral toxicity theory. In *Schafersman I*, we noted that Wass had testified that no single mineral was present in the contaminated oats at a level scientifically accepted to be toxic, although several minerals were present at above-normal levels. We further explained that by using the term "multiple mineral toxicity," Wass had meant that the combined effect of those minerals that were present in the contaminated oats at above-normal levels had made the cows ill. See *Schafersman I*. Wass now claims that some minerals were present in the contaminated oats at levels high enough that they alone could have caused the symptoms. Specifically, he claims that the contaminated oats contained enough copper to cause some symptoms that occurred in the Schafersmans' herd, including jaundice and death.

At the time of the original trial, the National Research Council had set the maximum tolerable level of copper for dairy cows at 100 parts per million (ppm). But Wass testified that a colleague at Iowa State University told him about a case where dairy cows had developed copper toxicity after receiving copper at a level of 40 ppm. Here, testing showed that copper was present at 58 ppm in the contaminated oats. Wass further testified that it is well accepted that dairy cows are more susceptible to copper toxicity if the ratio of copper to molybdenum in their diet is greater than 10:1. The ratio in the contaminated oats was 22:1.

Wass conceded, however, that the contaminated oats were not the only ingredient in the cows' diet. When the oats were delivered, they were mixed with corn and a mineral premix for dairy cows. In addition, the cows were also fed alfalfa and supplied with mineral blocks that they could lick. As we noted in *Schafersman I*, although Wass had the contaminated oats tested to determine their mineral makeup, he did not attempt to estimate the mineral makeup of the cows' complete diet.

In addition to the changes Wass made in his multiple mineral toxicity theory, he also took issue with our holding in *Schafersman I* that his clinical analysis had been inadequate because he had not ruled out other potential causes for the symptoms exhibited by the Schafersmans' cows. Wass conceded that there were other possible causes for the cows' symptoms and that he had not conducted testing to rule out those other causes. He testified, however, that some causes could be dismissed without testing because they rarely, if ever, occur in Nebraska. In addition, he repeatedly suggested that the clinical picture, i.e., the almost immediate onset of symptoms after the cows had eaten the contaminated oats and the lack of symptoms in the cows that did not eat the contaminated oats, made extensive testing for other causes unnecessary.

### (b) White

White currently is an animal production consultant. He holds a doctorate of veterinary medicine from Oklahoma State University and a master's degree in animal nutrition from the University of Nebraska. Until his retirement in 1998, he was a professor at the University of Nebraska, where he served as the director of research compliance services.

White did not become involved until after *Schafersman I*. Thus, he did not have the opportunity to physically examine the cows that ate the contaminated oats. He reviewed most of the trial record and spoke with Wass and John Schafersman. He also reviewed material addressing toxicology.

White opines that the methodology employed by Wass was reliable and consistent with that which is ordinarily employed by clinical veterinarians. He agrees with Wass that the cumulative effect of the minerals in the contaminated oats could have

caused the cows' symptoms, and he believes that Wass conducted a reliable clinical analysis.

### (c) Oraskovich

Oraskovich has a master's degree in education with an emphasis in dairy management and nutrition from the University of Minnesota. He is employed as an extension educator at the University of Minnesota, where he is responsible for the development of educational programs and working one-on-one with individual dairy producers and the agribusiness community. He is not a veterinarian.

Like White, Oraskovich did not become involved in the litigation until after *Schafersman I* and thus never had the opportunity to personally examine or conduct tests on the cows that ate the contaminated oats. In forming his opinion, he reviewed literature addressing mineral toxicity and the trial testimony.

Based on his professional experience, Oraskovich believes Wass employed reliable techniques in determining that the contaminated oats had caused the cows to become ill. Oraskovich agreed with Wass that the aggregation of minerals in the oats at above-normal levels could have caused the cows to become ill, although he was hesitant to label the theory "multiple mineral toxicity." He also agreed with Wass' revised theory that the amount of copper in the oats was sufficient to cause some of the cows' symptoms. To support this contention, he points to a chapter in a textbook on minerals, which cites recent research showing that copper toxicity can result when cows receive copper in their diet at a level of 40 ppm.

### (d) Agland's Experts

To counter the testimony of Wass, White, and Oraskovich, Agland relied on the expert testimony of three veterinarians, with one veterinarian specializing in epidemiology and one veterinarian specializing in toxicology. Each generally opined that (1) the Schafersmans' experts had not used reliable methodologies, (2) "multiple mineral toxicity" is not generally accepted and has not been subject to peer-reviewed scientific research, (3) the amount of copper in the contaminated oats was not capable of causing the cows' symptoms, and (4) Wass had failed to perform a reliable clinical analysis.

### (e) Trial Court's Decision

After discovery, Agland moved for a hearing under Neb. Evid. R. 104, Neb. Rev. Stat. § 27-104 (Reissue 1995), i.e., a *Daubert* hearing, requesting that the court determine whether the expert opinion testimony of Wass, White, and Oraskovich would be admissible at the second trial. After receiving evidence at the *Daubert* hearing, the court concluded that the expert opinion testimony of Wass, White, and Oraskovich was not admissible. Concerning the "multiple mineral toxicity" theory, the court ruled (1) it had not been peer reviewed, (2) it had not been tested, (3) it had no known or potential error rate, (4) it had not been generally accepted within the scientific community, and (5) no standard exists for determining what levels of any given mineral could result in a toxic effect. In addition, the court ruled that none of the Schafersmans' experts had performed a reliable differential diagnosis and that they had failed to employ sound epidemiological principles.

Agland then moved for summary judgment. In the motion, it contended that because the court had ruled that the Schafersmans' experts could not testify, there was no genuine issue of material fact concerning causation. The court granted the motion, and the Schafersmans appealed.

### II. ASSIGNMENTS OF ERROR

The Schafersmans assign, restated and consolidated, that the court erred in (1) ruling that the expert opinion testimony of their experts was inadmissible under the *Schafersman I/Daubert* standard and (2) granting summary judgment to Agland.

### III. STANDARD OF REVIEW

■ A trial court's ruling in receiving or excluding an expert's testimony which is otherwise relevant will be reversed only when there has been an abuse of discretion. *Carlson v. Okerstrom*, 267 Neb. 397, 675 N.W.2d 89 (2004); *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

■ A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial

right or a just result in matters submitted for disposition through a judicial system. *Carlson v. Okerstrom, supra.*

In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Francis v. City of Columbus*, 267 Neb. 553, 676 N.W.2d 346 (2004).

## IV. ANALYSIS

### 1. ADMISSIBILITY OF EXPERT OPINION TESTIMONY

#### (a) *Schafersman I/Daubert* Framework

Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), governs the admissibility of expert opinion testimony. It provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Section 702 requires that trial courts act as gatekeepers to ensure the evidentiary relevance and reliability of an expert's opinion. *Carlson v. Okerstrom, supra.* This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue. *Carlson v. Okerstrom, supra; Schafersman I.*

In *Schafersman I*, we noted several factors that might bear on a judge's gatekeeping determination: whether a theory or technique can be (and has been) tested; whether, regarding a particular technique, there is a high known or potential rate of error; whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community. "These factors are, however, neither exclusive nor binding; different factors may prove more significant in different cases, and additional factors may prove relevant under particular circumstances." *Id.* at 233, 631 N.W.2d at 877.

Since *Schafersman I*, we have ruled that in performing its gatekeeping duty, it is not enough for the trial court to determine that an expert's methodology is valid in the abstract. The trial

court must also determine if the witness applied the methodology in a reliable manner. *Carlson v. Okerstrom, supra.*

However, " 'the trial court's role as gatekeeper . . . is not intended to serve as a replacement for the adversary system.' " *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 250 (5th Cir. 2002) (quoting Fed. R. Evid. 702, advisory committee's note). Rather, the objective of the trial court's gatekeeping responsibility is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). See, also, *Rosen v. Ciby-Geigy Corp.*, 78 F.3d 316, 318-19 (7th Cir. 1996) (noting that object of *Daubert* standard "was to make sure that when scientists testify in court they adhere to the same standards of intellectual rigor that are demanded in their professional work. . . . If they do, their evidence (provided of course that it is relevant to some issue in the case) is admissible even if the particular methods they have used in arriving at their opinion are not yet accepted as canonical in their branch of the scientific community. If they do not, their evidence is inadmissible no matter how imposing their credentials").

(b) Application of *Schafersman I/Daubert* Framework

In *Schafersman I*, we stated that Wass' opinion that the contaminated oats caused the cows to become ill was "dependent upon the underlying theory of multiple mineral toxicity." 262 Neb. at 222, 631 N.W.2d at 871. Following remand, the court ruled that (1) the multiple mineral toxicity theory had not been peer reviewed, (2) it had not been tested, (3) it had no known or potential error rate, (4) it had not been generally accepted within the scientific community, and (5) no standard exists for determining what levels of any given mineral could result in a toxic effect. However, as we noted above, Wass altered his multiple mineral toxicity theory following remand. He now contends that the amount of copper in the contaminated oats could have caused the cows' symptoms. It is not clear from the trial court's order whether it detected this change in Wass' theory.

But it is unnecessary for us to consider whether Wass' revised theory of multiple mineral toxicity was reliable under

*Schafersman I/Daubert.* The lack of independent hard scientific support for multiple mineral toxicity was not the only reason the court gave for excluding the testimony of the Schafersmans' experts. It also ruled that they could not testify because they had failed to perform a reliable clinical analysis, specifically noting that none of the experts had conducted a differential diagnosis.

In *Schafersman I*, we gave the following critical description of Wass' clinical analysis:

> Wass testified that in preparing his opinion, he physically went to the Schafersman farm, but only examined the Schafersmans' records relating to the cows. Wass admitted that he did not perform a clinical examination of any of the cows and did not treat the cows. Wass did not perform any tests on the cows to rule out other causes of the jaundice that had been observed in the cows by the Schafersmans' veterinarian, nor did he test for copper toxicity, which Wass opined was a contributing factor to the illness afflicting the cows. Wass performed no tests to rule out other potential causes for the alleged drop in milk production. Wass acknowledged that he should have tested for copper toxicity and performed other tests on the cows. Wass further testified that while he tested a sample of the mixture delivered to the Schafersmans by Agland, he did not test the composition of the total ration actually fed to the cows after it was combined by the Schafersmans with corn and other nutrients.

262 Neb. at 220, 631 N.W.2d at 869. Later in our opinion, we pointed out that Wass admittedly had failed to perform a differential diagnosis, which we described as "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Id.* at 223, 631 N.W.2d at 871. See, also, *Carlson v. Okerstrom,* 267 Neb. 397, 675 N.W.2d 89 (2004) (discussing at length when differential diagnosis provides reliable basis for expert opinion testimony).

Nothing has changed on remand. Neither Wass, nor White, nor Oraskovich took any substantive steps to shore up the weaknesses we identified in Wass' clinical analysis. We do not hold that an expert must perform every step we identified in *Schafersman I* for

his or her clinical analysis to be reliable. But, given that the Schafersmans' experts did not perform any of those steps, the trial court did not abuse its discretion in refusing to admit their expert opinion testimony.

## 2. SUMMARY JUDGMENT

Next, the Schafersmans argue that the court erred in granting summary judgment for Agland. Summary judgment is proper when the pleadings and the evidence admitted at the hearing disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Francis v. City of Columbus*, 267 Neb. 553, 676 N.W.2d 346 (2004). Because the party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists, that party must therefore produce enough evidence to demonstrate his or her entitlement to judgment if the evidence remains uncontroverted. *Smeal v. Olson*, 263 Neb. 900, 644 N.W.2d 550 (2002). Once the movant has made this showing, the burden of producing contrary evidence shifts to the party opposing the motion. *Id.*

Agland supported its motion for summary judgment with, among other items, affidavits from its experts, each of whom testified that there was no scientific basis to claim that a causative link existed between the contaminated oats and the cows' illnesses. This was sufficient for Agland to meet its burden of production. The only contrary evidence the Schafersmans had was the expert testimony of Wass, White, and Oraskovich. But, as we have already determined, this evidence failed to meet the *Schafersman I/Daubert* standard. Thus, the Schafersmans could not rebut Agland's prima facie showing and the court correctly entered summary judgment for Agland.

## V. CONCLUSION

The court acted within its discretion in ruling that the opinions of the Schafersmans' experts were inadmissible, and it did not err in entering summary judgment for Agland.

AFFIRMED.