Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
05/12/2020 09:07 AM CDT

Michael T. and Cathy D. Christensen, individually
and as the parents and next friends of Chad
M. Christensen, and as the Coguardians and
Coconservators of Chad M. Christensen,
a protected person, appellants, v. Beverly
L. Sherbeck, Personal Representative
of the Estate of Albert F. Sherbeck,
deceased, and Beverly L. Sherbeck,
individually, appellees.

___ N.W.2d ___

Filed May 12, 2020.    No. A-19-124.

1. **Expert Witnesses: Appeal and Error.** Abuse of discretion is the proper standard of review of a district court's evidentiary ruling on the admission of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

2. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.

3. **Trial: Evidence: Appeal and Error.** To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted or excluded.

4. **Jury Instructions: Appeal and Error.** In reviewing a claim of prejudice from jury instructions given or refused, the instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error.

5. **Jury Instructions: Judgments: Appeal and Error.** Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court.

6. **Words and Phrases.** An unavoidable accident has been defined as an unexpected catastrophe which occurs without any of the parties thereto being to blame for it.

7. **Negligence: Proof.** A loss of consciousness constitutes an unavoidable accident and thereby a defense to an action based upon negligence; such a defense is an affirmative defense, and where the plaintiff has established a prima facie case of negligence, the burden of proof shifts to the defendant to establish the loss of consciousness defense.

8. \_\_\_\_: \_\_\_\_. Where a sudden loss of consciousness is an affirmative defense, a defendant's burden is twofold: First, the defendant must present sufficient evidence to establish that he suffered a sudden loss of consciousness prior to the accident, and second, the defendant must prove that the loss of consciousness was not foreseeable.

9. **Trial: Negligence: Motor Vehicles: Evidence.** When the evidence is conflicting as to whether the accident was caused by the driver's sudden loss of consciousness and whether the loss of consciousness was unforeseen, it is a question of fact to be determined by the jury; however, if the evidence points to only one reasonable conclusion, it is a question of law for the court.

10. **Jury Instructions: Appeal and Error.** It is error to give an unavoidable accident, or loss of consciousness, jury instruction where there is no evidence in the record to give legal support to the defense that the accident was unavoidable.

11. **Evidence: Circumstantial Evidence: Proof.** Any fact can be proved by direct or circumstantial evidence.

12. **Negligence: Motor Vehicles: Notice: Proof.** In establishing the loss of consciousness defense, the issue of foreseeability is crucial. The defense is not available where a driver was put on notice of facts sufficient to cause an ordinary and reasonable person to anticipate that his or her driving might likely lead to injury to others.

Appeal from the District Court for Custer County: KARIN L. NOAKES, Judge. Affirmed.

David S. Houghton and Keith A. Harvat, of Houghton, Bradford & Whitted, P.C., L.L.O., and John O. Sennett and

James V. Duncan, of Sennett, Duncan, Jenkins & Wickham, P.C., L.L.O., for appellants.

Daniel M. Placzek and Jared J. Krejci, of Smith, Johnson, Baack, Placzek, Allen, Connick & Hansen, for appellees.

Moore, Chief Judge, and Arterburn and Welch, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Michael T. and Cathy D. Christensen appeal from a judgment entered by the district court for Custer County which found in favor of Beverly L. Sherbeck and against the Christensens on the Christensens' claim for damages arising out of a motor vehicle accident involving their son, Chad M. Christensen, and Beverly's husband, Albert F. Sherbeck. Based on the jury's verdict that Albert suffered a sudden loss of consciousness prior to the collision, no damages were awarded to the Christensens. For the reasons set forth herein, we affirm.

## II. BACKGROUND

This action arises out of a motor vehicle accident that occurred in Custer County, Nebraska, on June 1, 2012. The following facts are not disputed: On the day of the accident, Albert was operating a pickup truck owned by himself and Beverly. He was driving toward his home and was headed eastbound on Highway 2 when he drove left of center and collided head on with a 10-passenger van traveling westbound. The van was transporting eight students from Broken Bow High School who were returning from a basketball clinic held in Kearney, Nebraska. The van was being driven by a basketball coach for the high school. As a result of the collision, Albert, the basketball coach, and the front seat passenger of the van, who was also a basketball coach for the high school, died at the scene. One of the students, Chad, was seriously injured.

## 1. Pleadings

In March 2013, the Christensens filed an amended complaint against Beverly, both in her individual capacity and in her capacity as the personal representative of Albert's estate. The amended complaint alleged that Albert was negligent in operating his vehicle and that Beverly was negligent in failing to prevent Albert from driving the vehicle or, in the alternative, was vicariously liable for Albert's negligence because he was operating the vehicle in order to further a family purpose. The Christensens sought general damages for Chad's "permanent[] disab[ility]" and future medical expenses for Chad's ongoing care. The Christensens filed a separate lawsuit against Broken Bow Public Schools.

In her second amended answer, Beverly asserted numerous affirmative defenses to the allegations contained in the complaint, including that "[t]he accident alleged in [the Christensens'] Amended Complaint occurred after Albert . . . suffered a sudden loss of consciousness that was not foreseeable." Beverly also filed a third-party complaint alleging that Broken Bow Public Schools was negligent in its operation of the van prior to the accident and that such negligence was a proximate cause of the injuries to Chad. We note that the claims against Broken Bow Public Schools are not discussed in this appeal.

## 2. The Christensens' Motion in Limine

Prior to trial, the Christensens filed a motion in limine seeking to exclude Beverly's proposed medical expert witnesses who were to testify that Albert suffered sudden cardiac death prior to the collision and was not conscious at the time of impact. In the motion, the Christensens alleged that the expert opinions should be excluded pursuant to the principles outlined in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 268 Neb. 138, 681 N.W.2d 47 (2004). A hearing was held on the motion in limine. At the hearing, the Christensens offered into evidence

numerous exhibits, including an accident report completed by the Nebraska State Patrol, depositions from witnesses to the collision, and depositions of four different medical experts.

### (a) Evidence Offered at Motion in Limine Hearing

The accident report, which was authored by Dion Neumiller, a trooper with the Nebraska State Patrol, detailed the results of the accident reconstruction analysis. The report indicated that Albert's pickup truck, which was facing eastbound, "had come to final rest" with its front axle in the westbound lane of Highway 2 and its rear axle on the westbound paved shoulder. The truck had "severe contact damage to the front of the vehicle[, which had] fold[ed] the hood rearward." The school van, which was facing westbound, "had come to final rest" also in the westbound lane. While the rear of the van was angled toward the shoulder, it still remained entirely within the westbound lane. The van "also had severe contact damage to the front, [which had] fold[ed] the hood rearward into the windshield." In his deposition, Neumiller explained that the accident resulted in a "nearly . . . head-on collision" such that the vehicles were lined up "license plate to license plate" when they came to a stop.

The accident report revealed that the airbag control module from the school van indicated that in the 5 seconds leading up to the collision, the van was slowing down. In fact, the antilock brakes on the van were engaged half a second prior to the collision. To the contrary, the airbag control module from Albert's pickup truck indicated that the truck continued at a consistent speed of 63 miles per hour in the 5 seconds leading up to the collision. Neumiller testified that there was no indication that the pickup truck's brakes were deployed at any point in the seconds leading up to the collision. Another trooper testified in his deposition that it is likely the pickup truck had its cruise control engaged at the time of impact. No preimpact or postimpact marks were located on the roadway.

The steering wheel of Albert's pickup truck was "fixed and rotated" to the right at approximately 20 degrees. Neumiller explained that this could indicate that "the last steering input made by the driver may have been to the right." However, Neumiller also indicated that there could be other reasons for the steering wheel to have been slightly rotated during or after the collision.

Although Albert did not have his seatbelt on, he was sitting upright in the driver's seat of the pickup truck at the time of the collision. His airbag was deployed and had "no significant blood" on it. Neumiller opined that the minimal amount of blood on the airbag could indicate that Albert was deceased prior to the collision.

Approximately 10 minutes prior to the collision, Albert initiated a telephone call using his cellular telephone. He spoke to a member of his church and inquired what songs the choir would be singing that Sunday. The telephone call lasted just over 5 minutes, and the recipient of the call later reported that Albert sounded "fine." After the collision, Albert's cellular telephone was located in his left shirt pocket. Albert's family, who spent the day with him prior to the collision, also indicated that Albert seemed fine, although he had mentioned feeling tired.

There were two witnesses to the collision, John Scott and Lavera Scott, who were in a vehicle which was traveling directly behind Albert's pickup truck. Both John and Lavera provided deposition testimony regarding their observations.

John testified that on the afternoon of the accident, he and his wife, Lavera, were driving eastbound on Highway 2, which was a two-lane highway. While he was driving, John observed a pickup truck approximately two blocks ahead of him on the highway. John estimated that the pickup truck must have been traveling between 55 and 60 miles per hour because John had his cruise control set at 60 miles per hour and "was beginning to gain a little on [the pickup truck]." John indicated that he could not see inside the pickup truck from his vantage point two blocks behind it.

Prior to the collision, John did not observe the pickup truck swerve either onto the shoulder or into the oncoming traffic lane. In fact, John indicated that he did not observe anything unusual about the pickup truck prior to the collision. John did observe the collision. He testified that the pickup truck suddenly "jumped over" in front of the van. He described the movement of the truck as not "slow," but "fast" and "[s]udden." John testified that the pickup truck moved directly over into the oncoming traffic lane. John indicated that he never saw the pickup truck's brake lights engage.

Although John did not know who was driving the pickup truck prior to the collision, when he approached the pickup truck after the collision, he learned that the driver was Albert. John testified that Albert was slumped down to the left after the collision. John was familiar with Albert and knew that some of Albert's farmland was adjacent to where the accident occurred.

Lavera testified similarly to John's testimony. She testified that she and her husband were driving "a couple of blocks" behind the pickup truck on the highway. From her vantage point, she could see that there was just one person in the pickup truck, but she was unable to observe specific movements of the sole occupant. Prior to the accident, she did not observe any unusual movement by the pickup truck. The pickup truck did not swerve onto the shoulder, did not move into the oncoming traffic lane, and did not swerve within its own lane. Lavera observed the collision. She described that "suddenly the pickup was there and then it wasn't there." The pickup truck had "almost jumped" into the oncoming lane of traffic. Lavera testified that the pickup truck's movement in this regard was "sudden." Lavera did not see the pickup truck's brake lights engage.

Lavera testified that since the date of the accident, she had been diagnosed with macular degeneration, which had somewhat affected her vision. However, she also testified that she had no trouble viewing the collision.

At the motion in limine hearing, the Christensens offered into evidence the deposition of one of the high school students who was riding in the school van at the time of the collision and who remembered the moments leading up to the accident. The student testified that immediately prior to the collision, he remembered the van's driver telling everyone in the van to "hold on." The student then looked up and observed a pickup truck "drifting into our lane." He described the motion of the pickup truck as seeming slow. The student also testified that he believed that the van's driver was attempting to avoid the impending collision by applying the brakes and trying to steer onto the shoulder of the road. We note that the Christensens also offered the deposition testimony of Chad. However, Chad is unable to recall any of the events surrounding the collision.

The remaining evidence offered by the Christensens at the motion in limine hearing was composed of deposition testimony from four medical experts. Two of the experts, Drs. Daniel McGowan and Jeffrey Mahoney, were retained by Beverly. The other two experts, Drs. Jeffrey Rubinstein and George Riley Nichols II, were retained by the Christensens.

McGowan is an interventional cardiologist who treated Albert for symptoms related to coronary disease beginning in February 2009. On February 27, McGowan diagnosed Albert as suffering from a 99-percent stenosis of the left circumflex artery. As a result of this diagnosis, McGowan placed a stent in that artery to improve blood flow. McGowan then prescribed beta-blocking medication for Albert in order to slow down his heart rate and treat both the blockage found in the left circumflex artery and Albert's ongoing coronary artery disease. McGowan was unsure if Albert continued to take this medication at the time of the collision.

McGowan also diagnosed Albert as suffering from a 75- to 80-percent stenosis in the right coronary artery. McGowan placed a stent in the right coronary artery in April 2009 and later, in January 2010, further repaired that artery with an atherectomy procedure.

In May 2009, Albert was diagnosed as suffering from reno-vascular hypertension after testing revealed a 60- to 70-percent stenosis of his right renal artery. McGowan believed that the stenosis of the right renal artery caused Albert to suffer from high blood pressure. McGowan indicated that Albert's high blood pressure was controlled with medication.

In February 2011, McGowan diagnosed Albert as suffering from mild left ventricular dysfunction. He described this condition as systolic dysfunction, which relates to how the heart contracts. Subsequent stress testing of Albert's heart revealed an "ejection fraction" of 50 percent, which is slightly below a normal ejection fraction of 55 percent or more. McGowan indicated that Albert's below normal ejection fraction was a residual effect of left ventricular heart damage, which was consistent with Albert's having suffered a prior heart attack.

On September 2, 2011, Albert returned to McGowan complaining of increased fatigue and shortness of breath during exertion. He also reported having felt heart palpitations a few weeks prior to this visit, which McGowan believed could indicate that Albert was experiencing an abnormal heart rhythm. Testing revealed that Albert was suffering from atrial fibrillation, a fast heart rhythm causing a lack of effective contraction. McGowan prescribed three different medications to treat this condition. After the September 2011 visit, Albert did not return to see McGowan prior to his death in June 2012.

After Albert's death, McGowan reviewed the autopsy report. Based on his review, McGowan believed that sometime after Albert's last office visit and before the day of his death, he suffered a heart attack which went untreated and which caused a "large scar" in the wall of his heart. McGowan stated that "the extent of the infarct on the autopsy was much more than what I saw on the imaging modalities that I used." McGowan did not, however, believe that Albert suffered a heart attack immediately prior to the collision because there were no observable signs of such a cardiac event in the autopsy. Rather, McGowan opined that Albert was at a high risk of suffering

a sudden cardiac death at the time of the collision and had, in fact, suffered sudden cardiac death immediately prior to the collision.

McGowan explained that sudden cardiac death "is when the heart goes into a rhythm that's very fast. Typically in that situation, the two rhythm disorders are ventricular fibrillation, ventricular tachycardia, where the heart's beating over 300 times a minute, cannot fill full of blood, and the patient will decompensate, pass out and die." McGowan further explained that there are no observable indications which can be found on an autopsy which would demonstrate that a person suffered sudden cardiac death. Rather, his opinion that Albert suffered sudden cardiac death prior to the collision was based upon

> the medical records from the time that [McGowan began] car[ing] for [Albert], which would include the extent of his coronary disease; his risk factors for sudden cardiac death, including, [age, male sex, atrial fibrillation, history of a coronary vascular disease event in the past year]; the autopsy findings of [an extensive infarct in the posterior-lateral distribution]; and also the cardiomyopathy or cardiomegaly that they found on autopsy.

McGowan essentially opined that while Albert was driving, he suffered from sudden cardiac death which made him pass out within a few seconds. Due to Albert's unconsciousness, he drove into the oncoming traffic lane and collided with the school van. McGowan indicated that he did not disagree with the official cause of Albert's death listed on his death certificate, which was multiple blunt force trauma to his head, neck, and trunk. McGowan simply opined that the collision was a result of Albert's suffering from sudden cardiac death.

Mahoney concurred with McGowan's opinions that Albert was at a high risk for sudden cardiac death and, in fact, suffered sudden cardiac death prior to the collision. Mahoney is a cardiologist who specializes in electrophysiology. Specifically, Mahoney specializes in diagnosing and treating conditions that may lead to sudden cardiac death, ventricular fibrillation,

or ventricular tachycardia. In forming his opinions, Mahoney reviewed Albert's medical records, the autopsy report, and various witness statements.

Based upon Mahoney's review of these documents, he opined that immediately prior to the collision, Albert suffered a sudden life-threatening abnormal heart rhythm that caused him to suddenly and abruptly lose consciousness, which in turn caused him to abruptly swerve into the oncoming lane and collide with the school van. Mahoney conceded that there was nothing specific observed during Albert's autopsy which definitively demonstrated that Albert suffered from sudden cardiac death; however, certain findings from the autopsy demonstrated that Albert was at a high risk for suffering from sudden cardiac death. These findings included "extensive coronary artery disease, a large posterolateral myocardial infarction, a large scar in the heart which . . . undoubtedly affect[ed] his pumping function of his heart."

Mahoney testified that the results of the autopsy revealed that sometime after May 2011 (the day of Albert's last stress test with McGowan) but before the day of the collision, Albert suffered a "silent[, but significant,] heart attack[]" which left a large scar in his heart. Mahoney opined that when considering Albert's history of heart-related problems together with the large scar from a significant heart attack observed during the autopsy, Albert's risk of sudden cardiac death in any given 5-year period was approximately 12 to 15 percent. He explained that research has demonstrated that 80 percent of patients who experience sudden cardiac death have suffered from coronary artery disease. Seventy-five percent of patients who experience sudden cardiac death have suffered a prior heart attack. Albert had both of those risk factors.

Mahoney ultimately opined that it is more likely than not that Albert died of a sudden cardiac death or an abnormal heart rhythm. He further explained that the "vast majority" of people who have sudden cardiac death have no prior symptoms: "They are perfect one second, the next second they collapse."

Rubinstein is a cardiologist who was retained by the Christensens to provide an opinion regarding whether Albert suffered sudden cardiac death prior to the collision. In reaching his opinion, Rubinstein reviewed Albert's medical records, the autopsy report, the death certificate, photographs, and witness statements. Rubinstein agreed with the opinions of McGowan and Mahoney that Albert was at risk for sudden cardiac death due to his coronary artery disease and some scarring in his heart. However, Rubinstein did not agree that Albert suffered sudden cardiac death prior to the collision. He opined that such an event was "highly unlikely," or at least no more likely than that Albert fell asleep prior to the collision or was distracted prior to the collision. Rubinstein indicated that there was no more than a 20-percent likelihood that Albert suffered a sudden cardiac event just prior to the collision.

Ultimately, Rubinstein asserted that any theory that Albert died, or suffered from, sudden cardiac death prior to the collision was "nothing more than pure speculation" because there is no way to definitively prove what happened in the moments leading up to the collision.

Nichols is a forensic pathologist who was retained by the Christensens to provide a further opinion regarding whether Albert suffered sudden cardiac death prior to the collision. In reaching his opinion, Nichols reviewed the autopsy report, the accident report, and some of Albert's medical records. Nichols opined that Albert did not suffer from sudden cardiac death prior to the collision. Nichols found evidence of "cardiac output" for "at least . . . a little while" after the accident, including the amount of blood in Albert's chest and abdominal cavities and surrounding his brain during the autopsy. He explained that such bleeding indicates that Albert's heart continued to work for some amount of time after the collision. In addition, Nichols pointed to the lack of any "acute finding in [Albert's] coronary arteries [to definitively demonstrate] sudden cardiac death." Although, Nichols conceded that it is impossible to view a fatal, irregular heart rhythm during an

autopsy. He also testified that Albert's heart showed irregularities, including evidence of a "large previous heart attack" and severe coronary artery disease.

Nichols also found evidence that Albert was seated upright in the driver's seat at the time of the collision because "a mark very similar to a steering wheel mark [was present] on his chest." Nichols opined that if Albert suffered sudden cardiac death prior to the accident and lost consciousness, his hands would have dropped from the steering wheel and he would have slumped over.

Finally, Nichols opined that any opinion that Albert suffered or died from a sudden cardiac event is nothing more than speculation. Nichols indicated that there is simply no way to determine whether Albert suffered from sudden cardiac death, because he was not wearing a heart monitor and no one was in the pickup truck with him to report what Albert experienced.

### (b) District Court Decision on the Christensens' Motion in Limine

After the hearing on the Christensens' motion in limine, the district court entered a detailed order denying, in part, and granting, in part, the motion. Specifically, the district court explained that Beverly's medical experts, McGowan and Mahoney, could testify as to two opinions if allowed by the court. First, they could testify that Albert was at a high risk of suffering a severe cardiac event, like sudden cardiac death. Second, they could testify that Albert did, in fact, suffer a cardiac event immediately prior to the collision which rendered him unconscious. The court noted, "Both opinions are relevant and would assist the trier of fact in determining the cause of the collision and whether the sudden loss of consciousness defense has been proven." However, that conclusion did not end the court's inquiry. The court then analyzed whether each opinion met "the additional requirements outlined in *Daubert* and *Schafersman*."

The district court found that McGowan's and Mahoney's opinion that Albert was at a high risk of suffering a severe cardiac event was admissible. The court indicated that both doctors are qualified to testify as experts regarding diseases of the heart and that the methodology and reasoning underlying each of their opinions about Albert's risk of suffering a severe cardiac event is scientifically valid and reliable. The court also indicated, "The factfinder should be allowed to weigh this evidence against the other possible causes to make [its] factual determination." Finally, the court found that the opinion was not substantially outweighed by the danger of unfair prejudice.

The district court found that McGowan's and Mahoney's opinion that Albert did, in fact, suffer a cardiac event immediately prior to the collision which rendered him unconscious was not admissible. The court pointed to the testimony of both doctors that there was no medical evidence to prove that Albert suffered a sudden cardiac event on the date of the collision and, as a result, found that the facts supporting the doctors' opinions are "lacking." The court also found that the reasoning and methodology the doctors used in arriving at each of their opinions that Albert suffered a sudden cardiac event just prior to the collision is not supported by the scientific tests and studies presented. The court indicated that the doctors could not give an opinion based upon inferences.

After the district court entered its order, the Christensens filed a supplemental motion in limine. In the motion, the Christensens renewed their argument that "any evidence relating to [Albert's] medical condition and the presence of risk factors immediately before the accident on June 1, 2012, including the testimony of . . . McGowan and . . . Mahoney," should be excluded. The court denied this supplemental motion. The court explained:

> The evidence is relevant. The jury is charged with determining the cause of the accident. [Beverly has] raised sudden loss of consciousness as a defense. [Albert's]

medical condition is relevant to that determination. It is also relevant to determine whether any possible loss of consciousness was foreseeable.

The admission of this evidence does not permit the jury to improperly speculate as to causation. [Albert's] medical condition is one of many facts and inferences the jury is allowed to consider when determining causation. The doctor[s'] testimony regarding his medical condition prior to the accident is not speculative. It is based on information these experts had direct knowledge of, is reliable and can be presented as circumstantial evidence by [Beverly] to prove loss of consciousness.

The court agrees that the causal link between [Albert's] medical condition and causation must be established through expert testimony. This is consistent with the court's prior ruling.

### 3. Trial

At trial, the parties presented voluminous evidence, some of which was previously offered during the hearing on the Christensens' motion in limine. Given the issues presented by this appeal, we limit our recitation of the evidence presented at trial to evidence that is relevant to Beverly's defense that Albert suffered a sudden loss of consciousness prior to the collision.

During the trial, the Christensens called Neumiller to testify regarding the results of his accident reconstruction investigation. Neumiller detailed the way the vehicles were situated after the impact and provided his opinion that the collision was "a near head-on collision with license plate almost to license plate." He also relayed the information gained from the airbag control modules of both vehicles, including that although the school van's brakes were engaged prior to the impact, Albert never engaged his pickup truck's brakes or even slowed down.

Neumiller indicated that Albert was likely seated in the driver's seat at the time of the collision. Neumiller testified

that the driver's side airbag did deploy in Albert's pickup truck and that it did have some blood on it which was consistent with Albert's facial injuries. In addition, the damage to the steering wheel was consistent with someone having been seated in the driver's seat. Neumiller did indicate, however, that there was not enough information to definitively determine whether Albert was seated upright or was slumped over the steering wheel at the time of the collision. Additionally, Neumiller noted that the airbag did not have "significant" amounts of blood on it which could indicate that Albert's heart had stopped pumping by the time of the collision. A sheriff's deputy, who was the first law enforcement officer to arrive at the scene of the collision, noted that although Albert's legs were in the driver's seat, the rest of his body "was laid over towards the passenger seat."

Neumiller testified that the steering wheel in Albert's pickup truck was rotated 20 degrees. Neumiller explained that rotation could be due to a number of reasons, including that Albert turned the wheel just prior to impact, that the force of Albert's body changed the position of the steering wheel during the collision, or that the steering wheel linkage was damaged during the impact.

Finally, Neumiller testified that although Albert used his cellular telephone to place a call approximately 10 to 12 minutes prior to the collision, there is no evidence to suggest he was using his cellular telephone at the time of the collision because it was found in his shirt pocket during the autopsy.

The Christensens next called Beverly to testify regarding Albert's activities on the day of the collision. Beverly testified that on June 1, 2012, she and Albert spent much of the day helping their son and daughter-in-law with a garage sale at the local fairground. In fact, the two had spent a "long and tiring day" the day before helping with the garage sale.

On the morning of June 1, 2012, Albert complained that his back was hurting, so he stayed behind at home while Beverly left to assist with the garage sale. Albert then arrived at the

sale at approximately 10:30 a.m. and began visiting with customers and accepting payments for the garage sale items. After lunch, Albert accompanied his son to deliver a table and chairs that had been purchased by a customer at the garage sale. When they returned to the sale, Albert resumed his place at the "money table" and continued to visit with customers. Beverly testified that Albert seemed "fine."

At approximately 3:30 p.m. that day, Albert indicated that the garage sale was no longer busy and that he was "kind of tired" so he was going to return home. Beverly testified that, at the time, she believed that Albert was more bored than he was tired.

Beverly testified that the collision occurred approximately three-fourths of a mile from the road which led to their home and 1 mile from their home. Directly adjacent to the collision site were fields which she and Albert owned, but which they rented out to others for farming. While Beverly explained that sometimes she and Albert would take a drive to check on the crops at the rented fields, Albert would always stop the vehicle to observe the fields, rather than just drive by. However, Beverly believed that at the time of the collision, the crops were not even up yet, so there would have been nothing to see in the fields. Beverly indicated that Albert would get tired while driving "[m]aybe once in a while."

By the time of the trial, the two witnesses to the collision, John and Lavera, were deceased. As a result, the Christensens read into evidence each of their deposition testimonies. The specifics of their depositions are detailed above in our recitation of the evidence offered at the hearing on the Christensens' motion in limine.

After the Christensens rested, Beverly offered into evidence the videotaped trial depositions of McGowan and Mahoney. The Christensens objected to this evidence, arguing that it was not relevant. Those objections were overruled.

McGowan testified that he is a board-certified interventional cardiologist. He explained that a cardiologist is a doctor

who cares for patients that have cardiovascular diseases. An interventional cardiologist cares for patients that have coronary disease, by implanting "stents [and] balloons" in both coronary arteries located within the heart and other arteries located throughout the body.

McGowan treated Albert from February 2009 through September 2011 for cardiovascular problems. In his trial deposition, McGowan explained the specific treatment he provided to Albert during this time period. This testimony is very similar to the testimony we detailed above in our recitation of the evidence offered at the hearing on the Christensens' motion in limine. As such, we do not reiterate the particulars of this testimony here, other than to note that during his trial deposition, McGowan provided further details regarding stress testing completed on Albert from February 2009 through September 2011. Such testing indicated that Albert's ejection fraction was normal after the stents were placed in the left and right sides of his heart. However, by May 2011, Albert's ejection fraction had dropped to "[l]ow normal." The last time that Albert saw McGowan in September 2011, he complained of fatigue, shortness of breath, and intermittent heart palpitations. Testing revealed that Albert was suffering from episodes of atrial fibrillations, indicating that the top chamber of his heart was not staying in rhythm and was not contracting effectively. McGowan prescribed a medication to try to normalize Albert's heart rhythm and another to thin his blood to reduce the risk of a stroke.

After Albert's death, McGowan reviewed the autopsy report. McGowan explained that many of the autopsy findings, as they related to Albert's heart, were "significant." The autopsy revealed that Albert's heart was enlarged and that he "had extensive coronary artery disease involving the left main artery. Two branches of the LAD called diagonals, as well as the right coronary artery, further show that he had an extensive infarct involving the left ventricular myocardium." McGowan explained that an infarct is a heart attack. He opined that

Albert had suffered a heart attack sometime between September 2011, when McGowan last examined Albert, and June 2012, prior to the collision. As a result of the heart attack, Albert had "extensive scarring" which placed him "at a much higher risk of abnormal heart rhythms and also sudden cardiac death." Sudden cardiac death is when a person's heart beats abnormally with no effective contraction. McGowan stated, "Those patients have complete hemodynamic collapse, will pass out, and will pass away" within seconds.

McGowan explained that an autopsy cannot show whether a person suffered sudden cardiac death, because an autopsy does not show how a person's heart was beating prior to death. However, McGowan opined that on the day of the collision, Albert was "at considerable increased risk for sudden cardiac death" based upon his clinical risk factors. Those factors included Albert's gender, the large size of his heart, and "his age, his established coronary disease, the extent of his coronary disease on autopsy, as well as his monitor showing PVCs, at times ventricular begeminy, as well as the extensive infarct report on the path sections." McGowan testified that patients do not typically have any warning that they are about to experience sudden cardiac death. McGowan testified that he never advised Albert to stop driving.

Mahoney testified that he is a board-certified cardiologist who specializes in electrophysiology. He explained that, essentially, he specializes in abnormal heart rhythms, including implanting pacemakers, defibrillators, and other heart failure devices. Mahoney reviewed Albert's medical records and the autopsy report. Based on his review of this information, he opined that Albert was at extremely high risk for suffering from sudden cardiac death on the day of the collision. Mahoney explained that when a person suffers from sudden cardiac death, they will "abruptly collapse."

Mahoney based his opinion on multiple factors. First, he found evidence in the autopsy report that Albert had suffered a heart attack sometime between his last stress test in May 2011

and approximately 6 weeks prior to the collision on June 1, 2012. This heart attack had caused "extensive scarring" within the heart which had left the heart wall muscle weak. Mahoney noted that Albert had never reported having such a heart attack to medical professionals. Mahoney did not believe Albert's lack of report to be unusual, as people have "silent" heart attacks all the time.

Second, Mahoney believed that the size of Albert's heart was a risk factor for sudden cardiac death. Mahoney stated, "[A]n enlarged heart would potentially put you at higher risk of sudden cardiac death in the general population." Other risk factors included Albert's suffering from significant coronary artery disease, from atherosclerotic heart disease, and from premature ventricular contraction. Mahoney further stated that 75 percent of patients who experience sudden cardiac arrest have a history of having a heart attack. Eighty percent of patients who experience sudden cardiac death have significant coronary artery disease.

Mahoney testified that there is no pathologic findings that can be observed during an autopsy to demonstrate that someone suffered from sudden cardiac death. Rather, an autopsy can demonstrate that someone was at significant risk for such an episode. Mahoney opined that Albert may not have had any warning that he was about to experience sudden cardiac death.

After Beverly rested her case, the Christensens read into evidence portions of Mahoney's discovery deposition, Nichols' discovery deposition, and Rubinstein's discovery deposition as rebuttal evidence. Beverly objected to this rebuttal evidence, but the objections were overruled.

The portion of Mahoney's discovery deposition that was read into evidence included his explanation of "typical" symptoms suffered during a "massive" heart attack. Mahoney explained that typical symptoms include crushing substernal chest pain, heaviness, shortness of breath, sweating, nausea, and vomiting. Mahoney indicated that there was no evidence that Albert

had ever presented to a medical professional complaining of those symptoms.

The portion of Nichols' discovery deposition that was read into evidence included his opinion that any theory that Albert either suffered or died as a result of any sudden cardiac event prior to the collision can be nothing more than pure speculation. Nichols explained this opinion as follows:

> If it's a cardiac event, you must have a monitor of some type on the person to be able to prove it, or an observer in the car with them to be able to make — make the observation. There's no witness in — in the pickup truck. I'm unaware of a monitor being placed upon him leading up to — to his — to the collision.

The portion of Rubinstein's discovery deposition that was read into evidence included his opinion that any theory that Albert either suffered or died as the result of a sudden cardiac death prior to the collision can be nothing more than pure speculation. Rubinstein explained, "He could've had multiple reasons to have driven into the other car." Rubinstein also indicated that there was no medical evidence to prove that Albert suffered a sudden cardiac event prior to the collision.

At the close of the evidence, the district court gave the jury an instruction on the loss of consciousness defense raised by Beverly, over the Christensens' objections. Jury instruction No. 2 read, in pertinent part:

### DEFENDANTS['] DEFENSE
### ISSUES

In defense to plaintiff's claims, Defendant Beverly Sherbeck, Personal Representative of the Estate of Albert Sherbeck, deceased[,] and Beverly Sherbeck claim that Albert Sherbeck suffered a sudden loss of consciousness prior to the collision.

### BURDEN OF PROOF

In connection with their claim that Albert Sherbeck suffered a sudden loss of [c]onsciousness, the burden is

on defendant to prove by the greater weight of the evidence both of the following:

1. That Albert Sherbeck suffered a sudden loss of consciousness prior to the accident; and

2. The loss of consciousness was not foreseeable.

EFFECT OF FINDINGS

If the defendant has met her burden of proving her defense, the[n] your verdict must be for Beverly Sherbeck, Personal Representative of the Estate of Albert Sherbeck, deceased, on this claim . . . .

Ultimately, the jury returned a verdict in favor of Beverly, both in her personal capacity and in her capacity as the personal representative of Albert's estate. Specifically, the jury found that although the Christensens had sufficiently proved their negligence claims, Beverly had also sufficiently proved that Albert suffered a sudden loss of consciousness prior to the collision.

The Christensens filed a motion for new trial alleging that the district court erred in instructing the jury on the loss of consciousness defense because there was not sufficient, competent evidence presented during the trial to prove that Albert had, in fact, lost consciousness prior to the collision. The Christensens stated that "the Court's instruction to the jury on sudden loss of consciousness materially affected the substantial rights of the [Christensens], is not sustained by sufficient evidence and is contrary to law." After a hearing, the district court denied the motion for new trial.

The Christensens appeal from the verdict entered against them and in favor of Beverly.

III. ASSIGNMENTS OF ERROR

On appeal, the Christensens allege, renumbered and consolidated, that the district court erred in (1) admitting into evidence the expert medical opinions of McGowan and Mahoney and (2) instructing the jury on the sudden loss of consciousness defense where there was not sufficient evidence presented at trial to support such a defense.

## IV. STANDARD OF REVIEW

[1-3] Abuse of discretion is the proper standard of review of a district court's evidentiary ruling on the admission of expert testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). *Gonzales v. Nebraska Pediatric Practice*, 26 Neb. App. 764, 923 N.W.2d 445 (2019). A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system. *Id.* To constitute reversible error in a civil case, the admission or exclusion of evidence must unfairly prejudice a substantial right of a litigant complaining about evidence admitted or excluded. *Id.*

[4,5] In reviewing a claim of prejudice from jury instructions given or refused, the instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and evidence, there is no prejudicial error. *Jay v. Moog Automotive*, 264 Neb. 875, 652 N.W.2d 872 (2002). Whether a jury instruction given by a trial court is correct is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *Id.*

## V. ANALYSIS

### 1. Admissibility of Expert Testimony
### on Loss of Consciousness Defense

On appeal, the Christensens assert that the district court erred in permitting McGowan and Mahoney to testify that Albert was at a high risk of suffering from sudden cardiac death. Although the Christensens broadly asserted in the district court that this expert medical testimony should be excluded pursuant to the principles outlined in *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc., supra*, and *Schafersman v. Agland Coop*, 268 Neb. 138, 681 N.W.2d 47 (2004), on appeal, the Christensens narrowed the focus of their argument to whether the expert opinions were relevant to the issue of the cause of the collision. Upon our review, we agree with the district court that McGowan's and Mahoney's opinion that Albert was at a high risk of suffering from sudden cardiac death was relevant in determining the cause of the collision.

In this case, the main issue in contention at trial was the cause of the collision. More specifically, the jury was asked to decide why Albert's pickup truck veered into the oncoming traffic lane and struck the school van. The Christensens offered the jury multiple theories to support their belief that Albert was negligent, including that Albert fell asleep while driving, that he became distracted by observing the status of the farmland he rented out, or that he intentionally caused the collision. Beverly offered the jury one theory: that Albert suddenly lost consciousness while driving after suffering from sudden cardiac death.

In order to support her theory of causation, Beverly offered expert medical testimony from McGowan and Mahoney that Albert was at a high risk for suffering from sudden cardiac death. The doctors also opined that if Albert had suffered from sudden cardiac death in the moments prior to the collision, he would have been rendered unconscious almost immediately. As the district court found, this expert medical testimony was relevant to the jury's determination of why Albert's pickup truck veered into the oncoming traffic lane. "Relevant evidence" is defined as that evidence which has any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence. Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 2016); *City of Omaha v. Savard-Henson*, 9 Neb. App. 561, 615 N.W.2d 497 (2000). Expert medical evidence that Albert was at a high risk

for suffering from sudden cardiac death makes it more probable that Albert did, in fact, suffer from such a cardiac event prior to the collision. In addition, evidence that Albert was at a high risk for suffering from sudden cardiac death makes it more probable that he lost consciousness prior to the collision with the school van. The expert medical evidence is also relevant to a determination of whether any loss of consciousness was foreseeable.

Moreover, it is clear from the testimonies of both McGowan and Mahoney that their opinions that Albert was at a high risk for suffering from sudden cardiac death were not speculative. Instead, the expert opinions were based upon both doctors' extensive knowledge in the area of heart-related conditions and the doctors' review of both Albert's medical records and the autopsy report. In fact, in the case of McGowan, his opinion was also based upon his direct treatment of Albert in the years prior to his death.

We find that the district court did not err in permitting McGowan and Mahoney to offer their expert medical opinions that Albert was at a high risk of suffering from sudden cardiac death at the time of the collision. The opinions were reliable and were relevant to the jury's determination of the ultimate cause of the collision.

## 2. JURY INSTRUCTION ON LOSS OF CONSCIOUSNESS DEFENSE

On appeal, the Christensens also renew the argument they raised multiple times before the district court that Beverly failed to meet her burden to establish the requisite elements of an unavoidable accident defense and that, as a result, the district court should not have instructed the jury regarding such a defense. Specifically, the Christensens assert that Beverly did not present sufficient, competent evidence to prove that Albert did, in fact, lose consciousness prior to the collision with the school van. The Christensens also assert that even if Beverly did sufficiently demonstrate Albert's loss of

consciousness, she failed to demonstrate the loss of consciousness was not foreseeable.

[6,7] An unavoidable accident has been defined by the Nebraska Supreme Court as an unexpected catastrophe which occurs without any of the parties thereto being to blame for it. *Storjohn v. Fay*, 246 Neb. 454, 519 N.W.2d 521 (1994). See *Owen, Administrator v. Moore*, 166 Neb. 226, 88 N.W.2d 759 (1958). A loss of consciousness constitutes an unavoidable accident and thereby a defense to an action based upon negligence. *Storjohn v. Fay, supra*. Such a defense is an affirmative defense, and where the plaintiff has established a prima facie case of negligence, the burden of proof shifts to the defendant to establish the loss of consciousness defense. See *id*.

[8-10] Where a sudden loss of consciousness is an affirmative defense, a defendant's burden is twofold: First, the defendant must present sufficient evidence to establish that he suffered a sudden loss of consciousness prior to the accident, and second, the defendant must prove that the loss of consciousness was not foreseeable. *Id*. When the evidence is conflicting as to whether the accident was caused by the driver's sudden loss of consciousness and whether the loss of consciousness was unforeseen, it is a question of fact to be determined by the jury. *Id*. However, if the evidence points to only one reasonable conclusion, it is a question of law for the court. *Id.* Accordingly, it is error to give an unavoidable accident, or loss of consciousness, jury instruction where there is no evidence in the record to give legal support to the defense that the accident was unavoidable. See *id*.

Albert died in the collision, so no light can be shed on his own experience immediately before the collision. In addition, there is no eyewitness who can directly confirm that Albert suddenly and actually lost consciousness prior to the collision, and no postaccident evidence exists that can directly confirm that Albert suddenly and actually lost consciousness prior to the collision. However, there is relevant evidence supporting each parties' position on the possibility that Albert lost

consciousness prior to his truck's entering the oncoming traffic lane and colliding with the school van.

The Christensens point to the lack of eyewitness testimony which would definitively demonstrate that Albert lost consciousness and slumped over prior to veering into the oncoming lane of traffic. Instead, the Christensens rely on evidence that Albert was seated upright in the driver's seat of his truck at the time of the collision, including evidence of Albert's blood on the driver's side airbag and his position immediately after the collision. The Christensens assert that, presumably, had Albert lost consciousness prior to the collision, he would not have remained seated upright, especially since he was not wearing his seatbelt. The Christensens also rely on the lack of any tangible, medical evidence that Albert suffered a heart-related incident prior to the collision.

To the contrary, Beverly offered evidence which suggests that Albert had lost consciousness prior to the collision. This evidence includes the expert testimonies of both McGowan and Mahoney that Albert was at a very high risk of suffering from sudden cardiac death, which would have caused him to lose consciousness in a matter of seconds. Both doctors also indicated that sudden cardiac death could not be readily identifiable during an autopsy. The deposition testimonies of John and Lavera indicate that Albert was driving his pickup truck straight down the road at a steady speed in the minutes prior to the collision until it "suddenly" "jumped over" into the oncoming lane of traffic and in front of the school van. Beverly suggests that this evidence indicates that something sudden and catastrophic happened in the moments leading up to the collision. Finally, Beverly points to evidence from the accident report which indicated that Albert failed to apply his truck's brakes or take any evasive action to avoid the collision in the seconds leading up to the accident. In fact, Albert's truck continued at a constant rate of speed in the seconds leading up to the collision. Neumiller, the author of the accident report, testified that there was a lack of any "significant" blood

on the driver's side airbag in Albert's truck. Neumiller opined that the lack of blood could indicate that Albert's heart had stopped pumping prior to the collision.

In their brief on appeal, the Christensens highlight that Beverly's assertion that Albert had lost consciousness prior to the collision is based upon circumstantial, rather than direct, evidence. The Christensens argue that a sudden loss of consciousness defense should only be available where there is direct evidence of a loss of consciousness, such as eyewitness testimony. They further assert that evidence that Albert lost consciousness prior to the collision "simply invited the jury to speculate." Brief for appellant at 30.

[11] The Christensens' argument that Albert's loss of consciousness had to be proved by direct evidence is not consistent with precedent from the Supreme Court which specifically recognizes that any fact can be proved by direct or circumstantial evidence. See, e.g., *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 65, 917 N.W.2d 435, 458 (2018) ("[c]ircumstantial evidence is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact"), citing *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995); *Carpenter v. Cullan*, 254 Neb. 925, 937, 581 N.W.2d 72, 80 (1998) ("'"[n]egligence, like any other fact, may be proved by circumstantial evidence . . ."'"), quoting *McVaney v. Baird, Holm, McEachen*, 237 Neb. 451, 466 N.W.2d 499 (1991).

Moreover, we agree with the district court that evidence of Albert's loss of consciousness did not invite the jury to speculate:

> The admission of this evidence does not permit the jury to improperly speculate as to causation. [Albert's] medical condition is one of many facts and inferences the jury is allowed to consider when determining causation. The doctor's testimony regarding his medical condition prior to the accident is not speculative. It is based on information these experts had direct knowledge of, is

reliable and can be presented as circumstantial evidence
by [Beverly] to prove loss of consciousness.

Although the evidence presented by Beverly that Albert had
lost consciousness prior to his truck's entering the oncoming
traffic lane and colliding with the school van was circumstan-
tial, we find that based upon all of the evidence presented at
trial, a jury could reasonably find that the collision was the
direct result of Albert's loss of consciousness. We now turn
to our analysis of whether Albert's loss of consciousness
was foreseeable.

[12] Even assuming that Albert suffered a sudden loss of
consciousness prior to the accident, we must examine the
record to determine whether such a loss was foreseeable. In
establishing the loss of consciousness defense, the issue of
foreseeability is crucial. The defense is not available where a
driver was put on notice of facts sufficient to cause an ordi-
nary and reasonable person to anticipate that his or her driving
might likely lead to injury to others. *Storjohn v. Fay*, 246 Neb.
454, 519 N.W.2d 521 (1994).

In this case, both McGowan and Mahoney testified that the
majority of people who suffer from sudden cardiac death have
no prior symptoms and no prior warning of their impending
heart condition. Mahoney explained that most people who suf-
fer from sudden cardiac death are "perfect one second" and
then "the next second they collapse." In addition, McGowan
testified that given his understanding of Albert's heart prob-
lems prior to the collision, he never advised Albert not to
drive a vehicle. The Christensens did not offer any evidence
to directly counter the expert testimony that Albert's sudden
loss of consciousness was not foreseeable. However, on appeal,
they point to Albert's extensive heart problems in the years
prior to the collision in arguing that Albert must have known
that he could experience another heart problem while driv-
ing. There is nothing in the record, however, to suggest that
Albert's known heart problems had ever affected his ability to
drive or had ever caused him to lose consciousness. Rather,

Albert described his principal symptoms as fatigue and shortness of breath.

Given all of the evidence presented at the trial, we cannot say that the district court erred in instructing the jury on the loss of consciousness defense. Beverly presented sufficient evidence for a reasonable jury to conclude that Albert lost consciousness prior to the collision, including expert medical testimony, eyewitness testimony from John and Lavera, and the results of the accident investigation. In addition, Beverly presented sufficient evidence for a reasonable jury to conclude that Albert's sudden loss of consciousness was not foreseeable. The decision of the district court in this regard is affirmed. The jury instruction regarding the loss of consciousness defense correctly stated the law and was adequately supported by the pleadings and the evidence.

## VI. CONCLUSION

We conclude that the district court did not err in permitting expert medical testimony that Albert was at a high risk of suffering from sudden cardiac death or in instructing the jury on the sudden loss of consciousness defense. Accordingly, we affirm.

AFFIRMED.